UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JEFFREY WYNTERS,

                              Petitioner,                    **DECISION AND ORDER**
                                                            **No. 04-CV-6012(VEB)**

        -vs-

SUPR. THOMAS POOLE,

                              Respondent.
_____

## INTRODUCTION

Petitioner, Jeffery[1] Wynters ("Wynters"), filed a *pro se* petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in Monroe County Court on May

11, 2000, on one count of first degree rape. The parties have consented to disposition of this

matter by the undersigned pursuant to 28 U.S.C. § 636(c).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The conviction here at issue stems from Wynters' alleged rape of thirteen-year-old V.R.

in January 1998. V.R. had met Wynters in 1997 while walking down Pennsylvania Avenue in the

City of Rochester on her way home from school with her friend Maria Hucks. T.223.[2] Maria[3] had

introduced the man as Anthony Wynters and said that he was a friend of her mother's (Yelta

Hucks). Between their initial meeting and the date of the incident, V.R. saw Wynters in August

_____

[1]        The Court notes that petitioner's first name is spelled "Jeffrey" in the caption, but in all of the
pleadings petitioner has submitted to the Court, he has spelled his name as "Jeffery."

[2]        Citations to "T.__" refer to the trial transcript.

[3]        Maria moved to North Carolina at the end of June 1997. T.226.

1

1997 at a Rite-Aid pharmacy; he asked her how school was going and told her that she "looked nice that day." T.227.  V.R. saw him again in November 1997 as she was walking down Pennsylvania Avenue on her way to school; he was driving the same red Dodge Neon. At that time, Wynters had offered to give V.R. ride home in his red Dodge Neon. V.R. declined, but she did take his pager number when he offered to take her out sometime. However, V.R. testified that she never paged Wynters. T.229.

In early January 1998, V.R. was walking to school down Pennsylvania Avenue at about 7 o'clock in the morning when Wynters pulled up next to her in his red Dodge Neon. He asked if she would like to go to breakfast with him. T.230. This time, V.R. accepted the offer and got into the car. V.R. testified that she was not afraid to get in the car with him because she "had met him before." T.231. Once she was inside the car, Wynters said that he needed to return to his house to get some money. When they arrived at Wynters' house on Melville Street, Wynters asked V.R. to come inside with him. V.R. agreed and followed him to his upstairs apartment.

Once there, V.R. sat in the living room on the couch while Wynters went to his bedroom. When he returned, he sat on the couch next to her and inquired as to whether she liked cartoons. Wynters then stood up and went back into the bedroom, returning a short while later. Wynters then asked V.R. if she had a boyfriend and complimented her, telling her that she was pretty. T.233-34. Wynters began touching V.R.'s legs and chest with his hands. Even though V.R. told him to stop and tried to push him away, he would not stop. T.234. Wynters pushed V.R. down on the couch and tried to kiss her. During this time, V.R. was crying and pleading with Wynters to stop. T.235. She continued to try to push Wynters off of her but she could not "[b]ecause he was bigger" than she. *Id.* Wynters then pulled off his sweatpants and, still holding V.R. down,

removed her pants. T.235-36. Wynters then forcibly raped V.R. by inserting his penis into her

vagina. V.R. continued to try to resist Wynters but her efforts were to no avail. T.236.

After he raped her, Wynters got off the couch and went into the bathroom. V.R. put her

pants on and started to leave but Wynters stopped her and told her to wait for him. T.237. She

stated that she complied because she was scared of him. *Id.* Wynters told her to come outside

with him and to get into his car, which she did. Wynters then drove her to school. As she was

exiting the car, Wynters "grabbed [her] leg" and threatened to kill her if she told anyone about

the rape. T.239. At trial, V.R. identified Wynters as the person she knew as "Anthony" and stated

that he was the rapist. T.225.

A year passed before V.R. reported the rape to anyone. She explained at trial that she was

scared and embarrassed, and believed that people would think it was her fault that she was raped

because she had gone with Wynters in his car. T.241. She stated that she was afraid that she

would get into trouble because her parents had a rule that she was not to get into cars with people

she did not know. T.241. V.R. testified that after the rape she had become depressed, was having

nightmares, had gained weight and began doing very poorly in school.  T.240-41. V.R.'s mother

noticed a dramatic change in V.R. at the time, but was unable to determine the cause. T.196-98.

During the spring of 1999, V.R. saw Wynters again while she was waiting at a bus stop.

Wynters was driving his red Dodge Neon. T242. V.R. testified that seeing Wynters made her

have thoughts of committing suicide. T.242-43. On May 30, 1999, V.R. went, on her own, to the

emergency room at Genesee Hospital for help. T.199, 243. While there, she was seen by Jay

Travers ("Travers"), a social worker who was the psychiatric assignment officer for the

emergency department. When she was asked if she had been raped or molested, she replied that

she had been. T.244.

Travers testified that he was specially trained in dealing with victims of sexual assaults; at the time he saw V.R., he had worked with hundreds of such victims. Travers observed that V.R.. was withdrawn and showed signs of depression. After speaking with V.R. for a while, V.R. eventually revealed that she was depressed because she had been raped. T.206-12. Travers testified that V.R.'s self-blame was typical in persons who are raped by someone they know. T.216.

After disclosing the rape to Travers, V.R. told her mother about the rape, and the police began investigating the claim. V.R. told the police a version of events that differed somewhat from the description of the rape set forth above. V.R. explained on direct examination that she told the police that one day after school she "was going to meet Maria and that's when [she] got raped. Her mom's boyfriend[4] raped [her]." T.245, 259. V.R. testified that she believed that Wynters (*i.e.*, Anthony) was Maria's "mom's friend." T.246. V.R. testified that she lied about the way she got to the place that she was raped because she did not want to get in trouble for going to Wynters' house or getting in the car with him. T.247, 248. V.R. told the police that she was supposed to be meeting Maria at Wynters house[5] but that when V.R. arrived, Maria was not there. *Id.* V.R. told the police that once she was inside, "Anthony raped [her]." *Id.* V.R. testified that her description to the police of the actual rape was true. T.248. V.R. also admitted that she told grand jury that she was going to Wynters' house to meet Maria. T.249. V.R. explained that

---

[4]     Apparently, Yelta Hucks' boyfriend was named Anthony Kimbrew. T.257. However, V.R. testified that she never meant to refer to Kimbrew when she was describing who raped her. *Id.*

[5]     As part of the investigation, Investigator Guidici drove with V.R. down Melville Street to see if she recognized the house to which she had been taken. V.R. pointed out #440; when Wynters was questioned in spring of 1999, he told the police that he had lived at 440 Melville Street for the past four and one-half years.

when she was talking to the assistant district attorney about the upcoming trial, the prosecutor

had asked her to think of anything she might have left out. According to V.R., that question made

her decide to tell the truth about the way she had gotten to Wynters' apartment. T.250, T.271-72.

On cross-examination, defense counsel elicited testimony from V.R. that she had a friend

named Vernon who apparently had given a statement to the police. V.R. admitted that what she

told Vernon was different from what she told the police and the grand jury, and how she testified

at trial. T.253. When asked whether what she told Vernon was true or not, V.R. stated that it was

a dream, that she "told him [she] had a dream" about being raped. *Id.*, T.270-71. T.270-71. On

re-direct, V.R. clarified that she had, in fact , had a nightmare about being raped the night before

the conversation with Vernon. When she told Vernon that, he asked her "had [she] been raped for

real." T.274. V.R. replied, "yes." Vernon asked her if she was going to tell her parents; she

replied that she was not. *Id.*

Defense counsel cross-examined V.R. about her statements to the police and the grand

jury in which she said that the rape happened at her friend Maria's house; she initially said that

"Maria's mom's boyfriend let [her] into the house" and then raped her. T.259. V.R. testified that

Maria lived on Garson Street but V.R. said that she did not tell the grand jury the address of the

house to which she was taken. T.260. On re-direct, V.R. stated that she told the grand jury that

she had been raped at a house on Melville Street. T.275.

V.R. admitted on cross-examination that at first she told the police that the rapist told her

that if she told anyone about the rape he "would do the same thing to Maria[.]" T.261. V.R.

conceded that, by the time of the rape in January 1998, she knew that Maria was no longer living

in Rochester. *Id.*

Earlier, on direct examination, V.R. had testified that Wynters was not wearing a condom. Defense counsel confronted V.R. with her grand jury testimony in which she stated that Wynters had a condom on when he was raping her. T.262. V.R. testified that she recalled giving that answer, but when asked whether he was in fact wearing a condom, she replied that he "might have been." *Id.* She said that she did not see him put one on. *Id.*

She admitted on cross-examination that when she went to the hospital to get treatment, she told an "incorrect story" about what had happened; she stated that she did not think that would affect the nature or the quality of the treatment she would get. T.265. Later on in the cross-examination, she stated that she did not tell anyone at the hospital the circumstances about the rape, just that she had been raped. T.270.

Defense counsel closely cross-examined V.R. about the circumstances of how she "decide[d] to change the story" that she was going to tell the court at trial. T.271. V.R. maintained that the prosecutor did not go over any of her other statements (*e.g.*, her grand jury testimony or police statement) with her; rather, the prosecutor "told [her] to think of anything [she] might have left out." T.272.

Investigator Cowley testified that upon his arrest, Wynters waived his rights and agreed to speak with the police. T.291. Wynters denied knowing V.R. and denied having raped anybody. T.292. Wynters stated that he had lived at 440 Melville Street for the past four and one-half years and that he drove a red Dodge Neon. *Id.* When asked the name by which people called him, Wynters responded, "Jeff." *Id.* He then stated that his middle name was Anthony. T.293. At one point, Investigator Cowley showed Wynters a photograph of two females, one of whom was V.R. Wynters pointed to V.R. and said that he had "seen her around on the street." T.294. The

6

interview terminated after Wynters requested an attorney.

After the investigator's testimony, trial counsel moved to dismiss the indictment on the basis that the complainant's testimony had been so discredited during cross-examination as to be wholly unbelievable and that the indictment itself was obtained by perjured grand jury testimony from the complainant. T.296-97. After a brief recess, the trial court held that even though the witness had testified differently as to some issues in the grand jury, it did not "rise[ ] to the level that would require a dismissal of the indictment." Rather, it was an "issue of credibility that the jury can utilize in determining the weight and believability of witness' testimony." *Id.*

Defense counsel called Kathleen Tanea ("Tanea"), the landlord who had rented an apartment on Vermont Street to Yelta Hucks and Anthony Kimbrew until March 16, 1998. T.309. Tanea testified that she never saw Wynters at the residence on Vermont Street rented by Hucks and Kimbrew. T.311. She conceded on cross-examination that she did not live in the same neighborhood as the rental property and although she went to the house to mow the lawn and make some repairs, she did not know everyone who came to the house. T.313.

The jury returned a verdict convicting Wynters on one count of first degree rape as charged in the indictment. Wynters was sentenced as a second felony offender on July 19, 2000, to a determinate term of twenty years in prison followed by five-years post-release supervision.

Represented by new counsel on appeal, Wynters sought review of his conviction in the Appellate Division, Fourth Department, of New York State Supreme Court. Appellate counsel argued that the prosecutor committed misconduct by eliciting testimony that Wynters had invoked his right to counsel during the police interrogation and refused to take a polygraph examination. Appellate counsel also contended that trial counsel was ineffective in failing to

register an objection to this prosecutorial misconduct during trial. The Appellate Division, Fourth

Department, of New York State Supreme Court unanimously affirmed the conviction. Leave to

appeal to the New York State Court of Appeals was denied. *People v. Wynters*, 99 N.Y.2d 586,

785 N.E.2d 744, 755 N.Y.S.2d 722 (N.Y. 2003).

This timely habeas petition followed in which Wynters raises the same grounds for relief

as raised by appellate counsel on direct appeal. Respondent answered the petition and interposed

the affirmative defense of procedural default with respect to Wynters' claim of prosecutorial

misconduct.

For the reasons set forth below, the petition is granted.

## DISCUSSION

### Standard of Review

To prevail under 28 U.S.C. § 2254, as amended by the Anti-terrorism and Effective Death

Penalty Act ("AEDPA") in 1996, a petitioner seeking federal review of his conviction must

demonstrate that the state court's adjudication of his Federal constitutional claim resulted in a

decision that was contrary to, or involved an unreasonable application of, clearly established

Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual

determination in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d)(1), (2);

*Williams v. Taylor*, 529 U.S. 362, 375-76, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a

federal claim." *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir. 2001) (quotation omitted). Under

the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a

conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state

court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 412-13 (O'Connor, J., concurring and writing for the majority in this part). The "unreasonable application" clause is applicable when "the state court identifies the correct governing legal principle from this Court" decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. In order to grant the writ there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

## Procedural Default

Where the highest state court that rendered a judgment in the case "clearly and expressly states that its judgment rests on a state procedural bar," such procedural default constitutes independent and adequate state grounds to deny habeas relief. *Harris v. Reed*, 489 U.S. 255, 263, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (internal quotations and citations omitted); *see also Glenn v. Bartlett*, 98 F.3d 721, 724 (2d Cir. 1996); *Levine v. Commissioner of Corr. Servs.*, 44 F.3d 121, 126 (2d Cir. 1995). In such cases, a federal court is generally barred from reviewing the petitioner's claims.  a federal habeas court may review a petitioner's claims only if the petitioner demonstrates (1) cause for the default and resulting prejudice, or (2) that the failure to consider the claims will "result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S.

722, 750, 111 S. Ct. 2546, 2566, 115 L. Ed.2d 640 (1991); *see also Edwards v. Carpenter*, 529

U.S. 446, 451, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000). As to the first test, "cause" is defined as

"'some objective factor external to the defense [that] impeded counsel's efforts' to raise the

claim in state court." *McCleskey v. Zant*, 499 U.S. 467, 493, 111 S.Ct. 1454, 113 L.Ed.2d 517

(1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)).

To demonstrate prejudice, the petitioner must show more than  that the errors "created a

possibility of prejudice, but [instead] that they worked to his actual and substantial

disadvantage." *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816

(1982). Where a petitioner is unable to show cause, the Court need not consider actual prejudice.

*See McCleskey*, 499 U.S. at 502.

On direct appeal, the Appellate Division, relying upon New York's contemporaneous

objection rule, held that Wynters' claim of prosecutorial misconduct was unpreserved for review

due to the lack of timely objection. *People v. Wynters*, 298 A.D.2d 852, 852, 747 N.Y.S.2d 619,

620 (App. Div. 4th Dept. 2002);  N.Y. Crim. Proc. Law § 470.05(2).[6]  The court also held that, in

any event, that claim and his remaining contentions were without merit. *Id.*  The Second Circuit

has held that New York's contemporaneous objection rule is an "adequate and independent" state

ground for procedural default in cases where defense counsel has failed to object to a

---

[6]        Section 470.05(2), which is known as the "contemporaneous objection rule," provides, in relevant
part, as follows:

> For purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court
> during a trial or proceeding is presented when a protest thereto was registered, by the party
> claiming error, at the time of such ruling or instruction or at any subsequent time when the court
> had an opportunity of effectively changing the same.

N.Y. Crim. Proc. Law § 470.05(2).

prosecutor's misconduct. *See, e.g.*, *Glenn v. Bartlett*, 98 F.3d at 724-25 (finding that failure to object to prosecutor's statements in opening and on cross-examination constituted adequate and independent state ground); *see also Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990) (violation of New York's contemporaneous objection rule is an adequate and independent state ground); *Garcia v. Lewis*, 188 F.3d 71, 79 (2d Cir. 1999); *Murray v. Carrier*, 477 U.S. at 485-92.

The Supreme Court has noted that "cause" in the context of procedural default must be something "external" to the petitioner, something that "cannot fairly be attributed to him." *Coleman v. Thompson*, 501 U.S. at 753. Attorney error that amounts to a denial of the Sixth Amendment right to the effective assistance of counsel can constitute such "cause." *Id.* at 753-54; *see also Edwards v. Carpenter*, 529 U.S. at 451; *McCleskey v. Zant*, 499 U .S. at 494. It is important to reiterate that "[a] defense counsel's ineffectiveness in failing to properly preserve a claim for review in state court can suffice to establish cause for a procedural default *only* when the counsel's ineptitude rises to the level of a violation of a defendant's Sixth Amendment right to counsel." *Aparicio v. Artuz*, 269 F.3d 78, 91 (2d Cir. 2001) (citing *Edwards v. Carpenter*, 529 U.S. at 451 (2000); *Murray v. Carrier*, 477 U.S. at 488-89) (emphasis supplied). "In other words, ineffective assistance adequate to establish cause for the procedural default of some other constitutional claim is itself an independent constitutional claim." *Edwards*, 529 U.S. at 451; *accord Aparicio*, 269 F.3d at 91.

Here, Wynters has not asserted "cause" or "prejudice," but the Court notes that he argued on direct appeal and argues now that trial counsel was ineffective in failing to object to the alleged misconduct. Construing Wynters' *pro se* pleadings to set forth the strongest argument

11

they can suggest, the Court finds that Wynters is alleging that trial counsel's ineffectiveness constitutes "cause" for the procedural default. As discussed below, the Court concludes that Wynters was deprived of his Sixth Amendment right to the effective assistance of counsel due to counsel's failure to object to the prosecutorial misconduct, and therefore counsel's alleged error can serve as "cause" to excuse the procedural default. As further discussed below, Wynters' was prejudiced not only by the prosecutor's misconduct but by counsel's ineffectual response to it. Thus, Wynters has made a sufficient showing to overcome the procedural default.

In order to arrive at its conclusion that trial counsel was ineffective in his handling of the prosecutor's flagrant misconduct, this Court necessarily had to review the substance of petitioner's prosecutorial misconduct claim. As outlined below, prosecutor introduced extremely prejudicial evidence during her direct examination of the investigator who interrogated Wynters–namely, the fact that Wynters terminated his interview with the police when he was asked to take a lie detector test. The prosecutor's examination of the investigator effectively constituted a concession of guilt by the petitioner and implicated several specific constitutional rights so as to effectively deny him the protection of those rights. Trial counsel in no way "invited" the prosecutor's conduct and, because counsel did not object, the trial court did not issue a curative instruction. The Court notes that counsel's failure did not relieve the trial judge of his obligation to, *sua sponte*, issue a curative instruction in order to protect the petitioner's rights. However, in a case such as this one, an instruction would not necessarily have been sufficient to ameliorate the prejudice caused to the petitioner by the prosecutor's misconduct. Moreover, this is not a case where the evidence against Wynters was overwhelming; the only evidence came from the victim, whose credibility was undermined by her admitted

inconsistencies and untruths in prior statements to the police and the grand jury. Petitioner's

credibility was effectively decimated by the prosecutor's invitation to the jury to infer that he was

guilty because he declined to take a polygraph. The Court concludes that, under the

circumstances, the prosecutor's conduct, although isolated, nevertheless rendered Wynters' trial

"fundamentally unfair." *See Darden v. Wainwright*, 477 U.S. 168, 181-82, 106 S.Ct. 2464, 91

L.Ed.2d 144 (1986). The Appellate Division's holding to the contrary was an unreasonable

application of this clearly established Supreme Court precedent.

## Merits of the Petition

### Ineffective Assistance of Trial Counsel – Failure to Object to Prosecutorial Misconduct

On direct appeal, the Appellate Division held that the claim of prosecutorial misconduct

was unpreserved due to trial counsel's failure to object, but still went on to consider the claim on

the merits. The state court found that there was misconduct, but that Wynters' right to a fair trial

was not sufficiently prejudiced by it: "Although the prosecutor improperly elicited that testimony

from the police officer, thereby 'implying that the jury could infer defendant's guilt from his

refusal to take a polygraph test' and his request for counsel," defense counsel's subsequent cross-

examination of that witness "blunted any prejudice to defendant[.]" *People v. Wynters*, 298

A.D.2d 852, 852, 747 N.Y.S.2d 619, 620 (App. Div. 4th Dept. 2002) (quotation and citations

omitted). In particular, the Appellate Division approved of the way defense counsel handled the

situation, noting that he "elicited testimony from the police officer that the duties of his job

included eliciting incriminating information from suspects, that defendant had denied

involvement in the crime, and that defendant had been cooperative with the police until he was

asked to take a polygraph test. At that time, defendant asked for an attorney, and the police

officer acknowledged that it was defendant's right to do so." *Id.*  The Appellate Division

therefore concluded that "under the circumstances of this case that defendant was not deprived of

his right to a fair trial by prosecutorial misconduct[.]" *Id.* (citations omitted). However, the

Appellate Division did not specifically address Wynters' related claim of ineffective assistance of

counsel, instead dismissing it summarily as "without merit." *Id.* The Appellate Division in this

case therefore adjudicated the ineffective assistance of counsel claim question "on the merits,"

and, because it also reduced its ruling to judgment, I must apply AEDPA deference to its

decision. *Jenkins v. Artuz*, 294 F.3d 284, 291 (2d Cir. 2002).

In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984), the Supreme Court

announced a two-part test for evaluating whether the assistance rendered by a petitioner's

attorney was ineffective: "First, the defendant must show that counsel's performance was

deficient. This requires showing that counsel made errors so serious that counsel was not

functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

Counsel's performance is to be judged by an "objective" standard of "reasonableness." *Id.* at 688.

The Supreme Court has explained that "[j]udicial scrutiny of counsel's performance must be

highly deferential" with the reviewing court making "every effort . . . to eliminate the distorting

effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to

evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Because there is a

"strong presumption that counsel's conduct falls within the wide range of reasonable professional

assistance," the petitioner must overcome the presumption that, under the circumstances, the

challenged action "might be considered sound trial strategy." *Id.* at 689 (citation omitted);

*accord*, *e.g.*, *Aparicio v. Artuz*, 269 F.3d at 95; *Sellan v. Kuhlman*, 261 F.3d at 315. Although an

attorney is "strongly presumed to have rendered adequate assistance," the "deficient performance" prong of *Strickland* is satisfied if the representation at issue falls "outside the wide range of professionally competent assistance." *Id.* at 690. While the *Strickland* presumption is "highly demanding," it is "by no means insurmountable[.]" *Kimmelman v. Morrison*, 477 U.S. 365, 382, 106 S.Ct. 2574, 2587, 91 L.Ed.2d 305, 323 (1986).

The second prong of the *Strickland* standard requires the petitioner to demonstrate that he was prejudiced by counsel's deficient performance. *Strickland*, 466 U.S. at 687. This in turn requires asking whether there is a "reasonable probability" that, without the mistakes made by counsel, the trier of fact would have had a "reasonable doubt" with respect to the petitioner's guilt. *Id.* at 695. Stated another way, the petitioner must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *accord Aparicio v. Artuz*, 269 F.3d at 95; *Sellan v. Kuhlman*, 261 F.3d at 315. A court analyzing *Strickland*'s "prejudice" component "must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695. Accordingly, the determination of prejudice necessarily is affected by the quantity and quality of other evidence against the defendant. *See id.* The Supreme Court observed that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696. The Court's focus is on the fairness of the trial he received, *United States v. Cronic*, 466 U.S. 648, 655-56, 104 S.Ct. 2039, 2046 n. 20, 80 L.Ed.2d 657 (1984); a showing of innocence is not required, *Kimmelman*, 477 U.S. at 380 ("[W]e have never intimated that the right to counsel is conditioned upon actual innocence. . . . Consequently, we decline to hold either that the guarantee of effective assistance of counsel belongs solely to

the innocent or that it attaches only to matters affecting the determination of actual guilt.")).

It bears noting that the prejudice a defendant must demonstrate is less than the "preponderance of the evidence" standard; in other words, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome of the trial." *Strickland*, 466 U.S. at 693; *see also Williams v. Taylor*, 529 U.S. at 405-06 (O'Connor, J., concurring) (stating at state court's rejection of ineffectiveness claim on grounds that prisoner failed to establish by "a preponderance of the evidence" that the outcome would have differed would be contrary to clearly established Supreme Court precedent). Moreover, "*Strickland*'s 'in light of all circumstances' review does not preclude a finding of ineffective assistance where the alleged deficient actions or omission centers upon a single incident, if that error is sufficiently egregious and prejudicial." *Chatom v. White*, 858 F.2d 1479, 1486 (11th Cir. 1988) (citing, *inter alia*, *United States v. Cronic*, 466 U.S. at 657 n. 20; *Strickland*, 466 U.S. at 693-96)), *cert. denied*, 489 U.S. 1054, 109 S.Ct. 1316, 103 L.Ed.2d 585 (1989).

In order to determine whether trial counsel was ineffective in failing to object to the prosecutor's cross-examination of the investigator, the Court shall focus on the merits of the underlying prosecutorial-misconduct claims. *Neill v. Gibson*, 278 F.3d 1044, 1058 (10th Cir. 2001) ("To resolve these claims [that trial counsel failed to object to prosecutorial misconduct], therefore, we focus on the merits of the underlying prosecutorial-misconduct claims.") (citing *Hooks v. Ward*, 184 F.3d 1206, 1221 (10th Cir. 1999)). The prosecutorial misconduct, and the related alleged error by trial counsel occurred during the direct examination of Investigator Cowley, the police officer who had interviewed Wynters regarding the incident. The prosecutor closed her questioning of Investigator Cowley with the following exchange:

Q:      At this point did you make a request of the Defendant?
A:      Yes, I did.
Q:      What did you ask him?
A:      If he would take a polygraph test.
Q:      What was the Defendant's response?
A:      He didn't want to speak to me any further without a lawyer present.
Q:      What did you do at that time?
A:      I ceased the interview.

         Ms. Briggs:    Thank you. I have no further questions.

T.294.  Defense counsel did not object. During his cross-examination of Investigator Cowley,

defense counsel engaged the officer in the following colloquy:

Q:      So, your job or assignment as it were[,] was to elicit information from the
         Defendant?
A:      That's correct.
Q:      Incriminating information?
A:      Yes, that's my job.
Q:      But he denied any involvement in the crime that you were asking him
         about?
A:      That's correct.
Q:      Now at one stage you asked him to take a lie detector test?
A:      Yes.
Q:      And at that stage he asked for an attorney?
A:      Yes, sir.
Q:      Right. Which is his right?
A:      That's correct.
Q:      I mean – he cooperated with you before asking for an attorney?
A:      Yes, sir.
         Mr. Bertram:   Thank you, Officer.

T.295. The prosecutor did not conduct any re-direct examination of the investigator. Trial

counsel did not ask for any curative instruction with regard to any of the investigator's testimony.

         The Supreme Court has explained that along with the great power accorded to the office

of a prosecutor comes a special responsibility to exercise that power fairly:

         [A prosecutor] is the representative not of an ordinary party to a controversy, but
         of a sovereignty whose obligation to govern impartially is as compelling as its
         obligation to govern at all; and whose interest, therefore, in a criminal prosecution

17

is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

*Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Unfortunately, when a prosecutor does act unfairly, striking a "foul blow," there is little a defendant can do other than rely on his or her attorney to register an appropriate and timely objection. "A failure to make such an objection can have devastating consequences for an individual defendant." *Hodge v. Hurley*, 426 F.3d 368, 377 (6th Cir. 2005) (holding that trial counsel's failure to object to repeated and egregious prosecutorial misconduct was professionally unreasonable and resulted in prejudice to the petitioner; state court's finding that counsel provided effective assistance was an "unreasonable application" of *Strickland v. Washington*) (citing *Gravley v. Mills*, 87 F.3d 779, 785-86 (6th Cir. 1996) (holding that a failure to object to repeated and egregious prosecutorial misconduct amounted to ineffective assistance of counsel sufficient to serve as "cause" to excuse a procedural default)).

The Supreme Court standard for evaluating prosecutorial misconduct is laid out in *Darden v. Wainwright*, 477 U.S. 168, *supra*. In *Darden*, the Supreme Court considered the following factors as relevant to determining whether a petitioner has been deprived of a fair trial: (1) whether the prosecutor's arguments manipulated or misstated the evidence; (2) whether the

remarks implicated specific rights of the accused, such as the right to remain silent; (3) whether

the defense invited the response; (4) the instructions of the trial court; (5) the weight of the

evidence against the petitioner; and (6) whether the defense was afforded an opportunity to rebut

the remarks. *Id.* at 181-82. Standing alone, a prosecutor's comments upon summation can "so

infect [a] trial with unfairness as to make the resulting conviction a denial of due process."

*Darden*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868,

40 L.Ed.2d 431 (1974) (internal quotation marks omitted)). However, as a habeas court, this

Court is mindful that its review is "the narrow one of due process, and not the broad exercise of

supervisory power[.]" *Id.* The Supreme Court has noted that it "regard[s] this observation as

important for not every trial error or infirmity which might call for application of supervisory

powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the

very concept of justice.'" *Donnelly v. DeChristoforo*, 416 U.S. at 642 (quoting *Lisenba v.*

*California*, 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166 (1941)).

"[W]hen specific guarantees of the Bill of Rights are involved, [the Supreme Court] has

taken special care to assure that prosecutorial conduct in no way impermissibly infringes them."

*Donnelly v. DeChristoforo*, 416 U.S. at 643.  The Supreme Court has drawn an important

distinction between an ordinary claim of prosecutorial misconduct and a claim that the

misconduct effectively deprived the defendant of a specific constitutional right. *See id.* ("This is

not a case in which the State has denied a defendant the benefit of a specific provision of the Bill

of Rights, such as the right to counsel, *Argersinger v. Hamlin*, 407 U.S. 25, 92 S.Ct. 2006, 32

L.Ed.2d 530 (1972), or in which the prosecutor's remarks so prejudiced a specific right, such as

the privilege against compulsory self-incrimination, as to amount to a denial of that right. *Griffin*

*v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) . . . . [H]ere the claim is only

that a prosecutor's remark about respondent's expectations at trial by itself so infected the trial

with unfairness as to make the resulting conviction a denial of due process. We do not believe

that examination of the entire proceedings in this case supports that contention.").

Certainly, trial counsel had grounds to object to the prosecutor's direct examination of

Investigator Cowley, which contained a "trifecta" of improper remarks. First, the investigator

referred to Wynters' invocation of his Fifth Amendment right to remain silent and to not

incriminate himself.[7] This was plainly improper. In *Baxter v. Palmigiano*, 425 U.S. 308, 319, 96

S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976), the Supreme Court reiterated the holding of *Griffin v.*

*California*, noting that "*Griffin* prohibits the judge and prosecutor from suggesting to the jury

that it may treat the defendant's silence as substantive evidence of guilt." *Accord United States v.*

*Robinson*, 485 U.S. 25, 32, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988) ("Where the prosecutor on his

own initiative asks the jury to draw an adverse inference from a defendant's silence, *Griffin* holds

that the privilege against compulsory self-incrimination is violated. But where as in this case the

prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made

---

[7]      The Second Circuit has explained that "'[w]hile it is axiomatic that the Government may not comment on a defendant's failure to testify at trial,' *United States v. McDermott*, 918 F.2d 319, 327 (2d Cir.1990), cert. denied, 500 U.S. 904, 111 S.Ct. 1681, 114 L.Ed.2d 76 (1991), '[i]n order to reverse a conviction for improper commentary on the right to remain silent, [it] must find that the comment was "manifestly intended or [was] of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."'" *United States v. Cicale*, 691 F.2d 95, 107 (2d Cir. 1982) (citation omitted), *cert. denied*, 460 U.S. 1082, 103 S.Ct. 1771, 76 L.Ed.2d 344 (1983)." *United States v. Pitre*, 960 F.2d 1112, 1124 (2d Cir. 1992) (alteration in original) (direct review case in which prosecutor commented on summation, "we have these people [*i.e.*, defendants] there with no plausible explanation;" court held that this was not an impermissible comment on defendant's right to not testify because "the government was responding to Otero's version of the facts as described in his testimony and argued in his counsel's summation"; remark was not intended by government to be a comment on the failure of any defendant to testify and jury would not "naturally and necessarily" view it as such; furthermore, district court, in its charge, explicitly instructed the jury that the burden of proof was always on the government and that no inference could be drawn from a defendant's failure to testify) (citation omitted).

by defendant or his counsel, we think there is no violation of the privilege."); *see also Lakeside v. Oregon*, 435 U.S. 333, 338, 98 S.Ct. 1091, 1094, 55 L.Ed.2d 319 (1978).  In this case, the Court is convinced that the prosecutor's elicitation of that testimony was "manifestly intended" and was "of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Pitre*, 960 F.2d 1112, 1124 (2d Cir. 1992) (citation and quotation omitted). Second, the prosecutor elicited testimony that Wynters had exercised his Sixth Amendment right to consult with an attorney. A defendant's right to seek the advice of counsel is a fundamental right, and prosecutors must refrain from commenting upon it. As the Supreme Court has explained, the right to counsel "is one of the safeguards of the Sixth Amendment deemed necessary to insure fundamental human rights of life and liberty. . . . The Sixth Amendment stands as a constant admonition that if the constitutional safeguards it provides be lost, justice will not 'still be done.'" *Johnson v. Zerbst*, 304 U.S. 458, 462, 58 S.Ct. 1019, 1022, 82 L.Ed. 1461 (1938) (citing *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937)). Third, the prosecutor, by introducing evidence that Wynters had stopped the interview when asked to undergo a polygraph, presumably was attempting to convey the message to the jury that it could infer his guilt from his failure to submit to the test.[8]

The Court finds that the prosecutor deliberately took this tack; she knew full well that the investigator would testify in this way, since he had provided this same testimony at the pre-trial

_____

[8]    *Compare with United States v. Kiszewski*, 877 F.2d 210, 216-17 (2d Cir. 1989) (agreeing that evidence that defendant refused to take a polygraph test was error, but holding that it was harmless because the matter about which defendant was suspected of lying was not directly at issue in this case; the agent's testimony was in response to a question by the court, not by the prosecutor, so there was no misconduct; defense counsel's apparent failure to make an immediate, specific objection, indicated that the reference "did not have a strong impact on the listener"; the reference was an isolated statement in a lengthy trial; and any prejudicial effect was "neutralized" by the district court's strong and timely corrective instruction).

suppression hearing. In a trial such as this one, where the result depended primarily on the jury's belief as to whether Wynters or the complainant was more credible, the Court notes that prosecutorial misconduct of the sort committed here is particularly disturbing.[9]

The Sixth Circuit in *Hodge v. Hurley*, in addressing whether trial counsel's "failure to object to any aspect of the prosecutor's egregiously improper closing argument was objectively unreasonable," observed that "[d]ecisions not to object to inadmissible evidence already heard by the jury can in many cases be classified as part of a deliberate strategy to avoid calling the jury's attention to that evidence. Nonetheless, such concerns are not themselves sufficient to preclude a conclusion of deficient performance, as the court must still consider whether the decision not to object was objectively reasonable." 426 F.3d at 385 (citing *Strickland*, 466 U.S. at 688) (emphasis omitted).

In this case, as evidenced by his subsequent cross-examination of Investigator Cowley, trial counsel clearly was aware that the prosecutor's direct examination of the investigator had been improper. Although he made an attempt to mitigate the damage done by this prejudicial evidence on cross-examination, there is no evidence that he made an intelligent, tactical decision not to object. The Court cannot discern a strategy in counsel's approach; the exchange between trial counsel and the investigator can only be read as an ineffectual and damaging cross-

---

[9]   The Court recognizes that the prosecutor, during her summation, did not mention the investigator's testimony about petitioner's decision to decline the polygraph examination, ask for an attorney and invoke his right to remain silent. In fact, the prosecutor's summation on the whole was not improper; trial counsel only objected at one point because he believed that the prosecutor was arguing that the victim had no motive to falsely accuse Wynters. T.336 ("What grudge would she have against him? Why would she pick him?"). Trial counsel objected that the remark unfairly implied that the defense had a burden of proof, and the trial court issued a curative instruction. T.336-37 ("The defense has no burden whatsoever. The burden is on the People. Additionally, the comments of counsel are not evidence. The evidence is what you have heard from the witness stand and the exhibits that were received.").

examination in which trial counsel only reinforced the negative evidence elicited on direct examination. He did this by having the investigator repeat his interview with the petitioner in which the petitioner terminated the session when asked to take a polygraph and requested an attorney.  This cross-examination most likely reinforced the jury's ability to draw the inference that the petitioner had a consciousness of guilt. Significantly, there were only two witnesses to the alleged crime.  The jury was presented with serious inconsistencies in the victim-witness' testimony, juxtaposed with evidence that the petitioner abruptly terminated his interview upon a police request that he take a polygraph, effectively requiring him to prove to them he was telling the truth. The logical inference to be drawn from this exchange, and apparently intended by the prosecutor, was that petitioner was concerned that the polygraph would demonstrate that he was lying.

        At best, trial counsel appears to have chosen the strategy of attempting to downplay the importance of the investigator's testimony by implying that the investigator, whose job it was to obtain incriminating information from suspects, was being stymied by Wynters' denial of any involvement in the crime and, out of desperation, was forced to resort to asking Wynters to take a polygraph test. While it would have been far more effective for trial counsel to have immediately asked for a mistrial (out of the presence of the jury) and, failing that, for a curative instruction, trial counsel inexplicably did neither. The question is whether trial counsel's strategy was objectively reasonable; the Court is not free to find that the chosen strategy was unreasonable simply because it would have handled the situation differently. Granted, this was not a case involving  "repeated and escalating prosecutorial misconduct from initial to closing summation, *Floyd v. Meachum*, 907 F.2d 347 (2d Cir. 1990)  (holding that cumulative effects of state

23

prosecutor's remarks in summation in state trial, which included both inflammatory comments and erroneous statements of law which implicated petitioner's specific constitutional right to remain silent, diverted jury from charges on which petitioner was being tried and from fundamental principles by which jury might discharge its duty warranting grant of habeas relief; prosecutor repeatedly and erroneously referred to Fifth Amendment burden of proof beyond a reasonable doubt, impermissibly asked jury to pass on prosecutor's personal integrity and professional ethics before deliberating on evidence implying that she personally vouched for credibility of main prosecution witness, and improperly characterized nontestifying defendant as a liar dozens of times). However, the Court is convinced that the improper references to the petitioner's constitutional rights, combined with the introduction of the prejudicial information that the petitioner had refused to take a polygraph test, amounted to flagrant abuse which warranted more than trial counsel's rather insipid attempt to "blunt" the prejudice. The Court recognizes that "[w]hile the instance in which a single error will rise to the level of Sixth Amendment ineffectiveness is clearly the exception and not the rule, this case is one of those exceptions." *Chatom v. White*, 858 F.2d at 1486 (in a murder prosecution the most damaging evidence against petitioner at trial consisted of the results of an "atomic absorption test"; trial counsel unreasonably failed to object to the test's admission despite having a basis for doing so).

First of all, the prosecutor deliberately and directly impinged on three of Wynters' constitutional rights–the right against self-incrimination, and the right to counsel, and by inference the right to remain silent. The questioning certainly was not in response to any improper conduct by defense counsel, so it was not a case of the prosecutor attempting to "right the scale." *Cf. Darden v. Wainwright*, 477 U.S. at 181-82 (holding that the prosecutors'

comments did not deprive petitioner of a fair trial since "[t]he prosecutors' argument did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent" and [m]uch of the objectionable content was invited by or was responsive to the opening summation of the defense") (citations omitted). Second, this was a she-said/he-said case, where credibility was paramount. The prosecutor's elicitation of Wynters' refusal to submit to a polygraph blatantly urged the jury to infer petitioner's guilt and was a serious error. *See United States v. St. Clair*, 855 F.2d 518 (8th Cir. 1988) (reversing conviction, despite curative instruction, in case where police officer volunteered that the defendant had refused to take a polygraph test; curative instruction was insufficient, because the credibility of the defendant was crucial and the officer's statement about the polygraph test would necessarily influence the jury). That evidence was put squarely before the jury and there was nothing limiting them from taking the prosecutor's invitation and drawing the inference. Because trial counsel did not object, and the trial court did not *sua sponte* intervene, the jury could well have believed that this evidence was proper. In the face of this prejudicial testimony, trial counsel was unreasonable in not objecting and requesting at least a curative instruction, if not a mistrial. Trial counsel's cross-examination, standing alone, was insufficient to "blunt the prejudice" given the nature of the case against his client and the lack of overwhelming evidence against him. The Court cannot find that the failure to object in some way to the prosecutor's misconduct was a part of any reasonable trial strategy and instead was predictably detrimental to Wynters' defense.

Because the jury necessarily discredited his denial of guilt, Wynters can make a plausible argument that the polygraph reference prejudiced him. The prosecution's case here was hardly

overwhelming: since there was over year's delay in the victim's reporting of the incident, physical evidence was wholly lacking. More important, the case depended utterly on the testimony of the victim and her credibility compared to Wynters, who denied any involvement in the crime. It is inexplicable why trial counsel chose to allow, without objection, Investigator Cowley's improper testimony, which so clearly undermined his client's credibility. This was tantamount to a concession of guilt and similarly bolstered the credibility of the state's case and the investigator by allowing him to repeat the prejudicial testimony on cross-examination. The crucial point here is that the jury was never informed that the inference implied by the prosecutor was actually improper, because trial counsel did not make reasonable efforts to ensure this. Because the credibility of the actors was so critical at trial, there is reasonable probability that, but for counsel's conduct with respect to the improper testimony elicited by the prosecutor, the jury could easily have had a reasonable doubt respecting petitioner's guilt. Thus, there is more than a reasonable probability that these errors had a devastating impact on the defense in this particular case.

The Court is compelled to find that the prosecutor's misconduct, and trial counsel's failure to address it, impermissibly impinged upon the fundamental fairness of Wynters' trial and resulted in constitutional prejudice. Accordingly, the state court's summary rejection of Wynters' ineffective assistance of counsel claim was an unreasonable application of *Strickland v. Washington*.

## CONCLUSION

For the reasons set forth above, petitioner's petition for a writ of habeas corpus is granted. The petitioner shall be released unless, within sixty (60) days from entry of judgment, the state

commences prosecution. This decision is stayed until all appellate proceedings are completed and

a final mandate is received by this court.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:       December 1, 2006
                      Rochester, New York.